2014-1511

---

### United States Court Of Appeals for the Federal Circuit

# THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS,
*Appellant,*

v.

# MICRON TECHNOLOGY, INC.,
*Appellee,*

---

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE BEFORE THE PATENT TRIAL AND APPEAL BOARD IN CASE NO. IPR2013-00008

ADMINISTRATIVE PATENT JUDGES SALLY GARDNER LANE, BRYAN F. MOORE, AND MICHAEL J. FITZPATRICK

---

## MICRON'S OPPOSITION BRIEF

---

Ruffin B. Cordell
Timothy W. Riffe
Adam R. Shartzer
Fish & Richardson P.C.
1425 K Street, NW, 11th Floor
Washington, DC 20005
Tel: (202) 783-5070
Fax: (202) 783-2331

ATTORNEYS FOR APPELLEE,
MICRON TECHNOLOGY, INC.

October 14, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Micron Technology, Inc., certifies the following:

1.      The full name of every party or amicus represented by me is:  Micron Technology, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: N/A.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Fish & Richardson P.C.:  Ruffin B. Cordell, Timothy W. Riffe and Adam R. Shartzer.


Dated:  October 14, 2014

/s/ Adam R. Shartzer
Adam R. Shartzer

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................... ii

STATEMENT OF RELATED CASES ................................................. 1

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE ............................................................... 4

COUNTERSTATEMENT OF FACTS ................................................. 8

I.     The '387 Patent ......................................................................... 8

II.    The '387 Patent in View of the Related '204 Patent Prosecution ............. 9

III.   The Prior Art .......................................................................... 11

       A.     Lisenker ...................................................................... 11

       B.     Deal .............................................................................. 14

IV.    The Board's Findings ............................................................. 14

       A.     Product-By-Process Claim Format ................................. 14

       B.     The Lisenker Prior Art Reference .................................. 15

       C.     The Deal Prior Art Reference......................................... 16

INTRODUCTION ............................................................................... 18

ARGUMENT ...................................................................................... 21

V.     The Board Relied on Substantial Evidence to Determine That the 10-Fold Semiconductor Lifetime Improvement is Inherently Disclosed in the Prior Art ......................................................................... 21

       A.     Substantial Evidence Supports the Board's Finding That Lisenker Inherently Discloses the 10-Fold Improvement Because Lisenker

Teaches the Identical Process and Structure Disclosed by the '387 Patent ............................................................................... 22

    1.    According to the '387 patent, a 10-times semiconductor lifetime improvement derives from deuterium retained at the interface from deuterium passivation. ............................ 22

    2.    Lisenker discloses the same operative structure and process that the '387 patent discloses. ................................. 27

    3.    The prior art's inherent teachings are not defeated by alternatively-taught embodiments. ......................................... 30

    4.    The Board did not err in referencing the teachings of the '387 patent specification as to inherency. ............................ 31

    5.    Merely measuring and claiming an existing characteristic result of a known process does not make the result patentable. ................................................................................ 31

B.    Lisenker's Inherent Disclosure of the 10-Fold Improvement is Confirmed by the Evidentiary Record ............................................. 33

    1.    The prior art Mikawa reference experimentally confirms a 10-fold semiconductor lifetime improvement as a result of practicing Lisenker's post-metal deuterium passivation process. ................................................................................. 33

    2.    Evidence before the Board confirmed Lisenker's teaching of a 10-times semiconductor lifetime improvement. .......... 34

VI.    Even if the 10-Fold Lifetime Improvement is not Inherent, the Board Relied on Substantial Evidence to Determine That it is Obvious ........... 36

    A.    Lisenker in view of Hwang renders claim 2 obvious. .................... 36

    B.    Lisenker in view of Hwang and Deal renders claim 2 obvious. .... 39

    1.    Noting that Deal's teachings were undisputed, the Board properly combined Lisenker with Hwang and Deal to obviate claim 2. ........................................................................ 39

2.    The University's current argument against the combinability of Lisenker in view of Hwang and further in view of Deal is waived.............................................. 40

C.    Deal in view of Hwang and Lisenker renders claim 2 obvious. .... 41

1.    The University does not challenge the Board's factual findings. ..................................................................... 41

2.    The University's challenge to Lisenker's teaching is irrelevant to how Lisenker is used in the combination of Deal in view of Hwang and Lisenker................................... 42

3.    The University's current argument against the combinability of Deal in view of Hwang and Lisenker is waived. .................................................................................. 43

D.    A Change In Degree Is Not A Patentable Distinction ................. 44

VII.    The Board Did Not Err Because the 10-Fold Lifetime Improvement Must not be Considered for Purposes of Patentability ........................... 45

A.    Product-by-Process Treatment of Claim 2 Removes the 10-Fold Lifetime Improvement From the Patentability Determination .... 45

B.    The Law Does Not Support the University's Arguments, Which Were Properly Rejected by the Board .............................................. 47

C.    The University Failed to Raise Below or Argue on Appeal the Board's Product-by-Process Treatment of Claim 2 and Has, Therefore, Waived This Issue. ........................................................ 48

CONCLUSION ................................................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Baxter Pharm. Prods.*,
    471 F.3d 1363 (Fed. Cir. 2006)........................................................................32

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
    334 F.3d 1343 (Fed. Cir. 2003)........................................................................49

*Amgen Inc. v. F. Hoffman–La Roche Ltd.*,
    580 F.3d 1340 (Fed. Cir. 2009)...................................................................45, 47

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014)..........................................................................9

*Application of Aller*,
    220 F.2d 454 (Cust. & Pat. App. 1955) ..........................................................39

*Application of Blondiau*,
    181 F.2d 223 (Cust. & Pat. App. 1950) .....................................................38, 44

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012)........................................................................33

*Atlas Powder Co. v. Ireco, Inc.*,
    190 F.3d 1342 (Fed. Cir. 1999)........................................................................30

*In re Baxter Int'l Inc.*,
    678 F.3d 1357 (Fed. Cir. 2012)........................................................................49

*In re Baxter Travenol Labs.*,
    952 F.2d 388 (Fed. Cir. 1991)..........................................................................36

*In re Berger*,
    279 F.3d 975 (Fed. Cir. 2002)....................................................................40, 43

*Brassica Prot. Prods. LLC v. Sunrise Farms (In re Cruciferous Sprout Litig.)*,
    301 F.3d 1343 (Fed. Cir. 2002)........................................................................32

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001)........................................................................32

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938).........................................................................................21

*Engel Indus., Inc. v. Lockformer Co.*,
    166 F.3d 1379 (Fed. Cir. 1999)...........................................................49

*In re Giuffrida*,
    527 Fed. Appx. 981 (Fed. Cir. 2013)...................................................33

*In re Glaug*,
    283 F.3d 1335 (Fed. Cir. 2002)...........................................................28

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)...............................................................................21

*Greenliant Sys., Inc. v. Xicor LLC*,
    692 F.3d 1261 (Fed. Cir. 2012)......................................................47, 48

*In re Huston*,
    308 F.3d 1267 (Fed. Cir. 2002)...........................................................33

*In re Jolley*,
    308 F.3d 1317 (Fed. Cir. 2002)...........................................................21

*In re Kao*,
    639 F.3d 1057 (Fed. Cir. 2011).................................................. *passim*

*King Pharm., Inc. v. Eon Labs., Inc.*,
    616 F.3d 1267 (Fed. Cir. 2010)...........................................................27

*In re Kubin*,
    561 F.3d 1351 (Fed. Cir. 2009)......................................................28, 31

*Microsoft Corp. v. Multi–Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004).............................................................9

*Novosteel SA v. U.S.*,
    284 F.3d 1261 (Fed. Cir. 2002)...........................................................49

*Para–Ordnance Mfg., Inc. v. SGS Imp. Int'l, Inc.*,
    73 F.3d 1085 (Fed. Cir. 1995).............................................................21

*Rembert et al. v. Coe*,
    136 F.2d 793 (D.C. Cir. 1943).............................................................38

*Rexnord Indus., LLC v. Kappos*,
    705 F.3d 1347 (Fed. Cir. 2013)...........................................................37

*Santarus, Inc. v. Par Pharm., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012)...........................................................37

*In re Schreiber*,
    128 F.3d 1473 (Fed. Cir. 1997)..................................................................40, 43

*Smith v. Nichols*,
    88 U.S. 112 (1874)........................................................................................38

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006)....................................................................45

*In re Sullivan*,
    498 F.3d 1345 (Fed. Cir. 2007)....................................................................21

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001)....................................................................21

*In re Thorpe*,
    777 F.2d 695 (Fed. Cir. 1985)......................................................................45

*In re Watts*,
    354 F.3d 1362 (Fed. Cir. 2004)..........................................................40, 43, 49

# STATEMENT OF RELATED CASES

The University's statement of related cases is accurate to Micron's understanding.

# STATEMENT OF JURISDICTION

The University's statement of jurisdiction is accurate.

# STATEMENT OF THE ISSUES

The University's statement of the issues is inaccurate for several reasons. First, the Board found that claim 2 of the '387 patent is rendered obvious over the following three grounds:

> i) Lisenker[1] in view of Hwang[2];
>
> ii) Lisenker in view of Hwang and Deal[3];
>
> iii) Deal in view of Hwang and Lisenker.

Thus, the issues are those of obviousness and not anticipation, where the University must prevail over all three obviousness determinations to otherwise disturb the Board's judgment. The University also fails to identify the proper standard of review. The issues when stated accurately are:

1. Claim 2 of U.S. Patent No. 5,872,387 ("the '387 patent") claims a field effect transistor device having deuterium at the interface between a silicon

---

[1]     A2499–A2517 (WO 94/19829 to Lisenker *et al.* (Sep. 1, 1994).)

[2]     A2496–98 (Hwang, *Improved Reliability Characteristics of Submicrometer nMOSFET's with Oxynitride Gate Dielectric Prepared by Rapid Thermal Oxidation in $N_2O$* (Sept.,1991).)

[3]     A2518–27 (U.S. Patent No. 4,027,380 to Deal et al. (June 7, 1977))

semiconductive layer and a gate oxide layer (insulator) as the result of at least a post-fabrication passivation process step to provide a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen. Lisenker discloses a semiconductor device having deuterium at the interface between a semiconductive silicon layer and a gate insulating layer (hereinafter, "the interface") in such an amount that the ratio of deuterium containing bonds to hydrogen containing bonds is 99 to 1. Thus, Lisenker discloses i) the identical mechanisms (pre- and/or post-metal passivation in deuterium) and ii) the identical structure (deuterium at the interface) disclosed by the '387 patent for obtaining the "ten times" lifetime improvement. Lisenker also recognizes that replacing deuterium with hydrogen will result in devices having "improved stability, quality, and reliability." Hence, the first issue on appeal is whether substantial evidence supports the Board's finding that the element from claim 2 of the '387 patent: "to provide to said transistor a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen gas" is disclosed or rendered obvious by Lisenker in view of Hwang and Lisenker in view of Hwang and Deal.[4]

2. Deal discloses a field effect transistor with an interface between a semiconductive silicon layer and a gate oxide layer and performing a post-metal

---

[4]    The University does not appeal any issue germane to either the teachings or combinability of Hwang. Hwang is combined for its express teaching of an oxide layer comprising silicon oxynitride.

passivation step in hydrogen.  Lisenker discloses substituting deuterium for hydrogen throughout the VLSI procedure, which includes a post-metal passivation step.  Thus, the second issue on appeal is whether substantial evidence supports the Board's finding that the limitation from claim 2 of the '387 patent: "to provide to said transistor a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen gas," is disclosed or rendered obvious by Deal in view of Hwang and Lisenker.

3. The Board construed claim 2 of the '387 patent as a product-by-process claim such that the process limitations which includes a recitation: "to provide to said transistor a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen gas" need not be considered for patentability.  This finding renders Issues 1 and 2 moot.  Therefore, the third issue on appeal is whether the University can even challenge whether the prior art inherently discloses a ten-times lifetime improvement in view of the Board's determination that the aforementioned limitation need not be considered for patentability.[5]

---

[5]     The University failed to challenge the Board's claim construction decision in its Blue brief and has, therefore, waived this issue.

## STATEMENT OF THE CASE

This is an appeal from an *inter partes* review proceeding as to the University's '387 patent, which relates to annealing (also known as passivating) semiconductor devices with deuterium instead of hydrogen. This appeal is about whether the recitation of a quantified (10-fold) "practical lifetime" improvement in product-by-process claim 2 of the '387 patent is a patentable distinction over the prior art. The prior art indisputably discloses the identical structure and process that the '387 patent discloses to achieve the claimed 10-fold semiconductor lifetime improvement.

Micron sought *inter partes* review of the '387 patent on October 2, 2012, along with two other patents that are relatives of the '387 patent. The Board's final written decisions in the *inter partes* reviews of those related patents are also subject to appeal in the consolidated case. The Board instituted *inter partes* review of all claims of the '387 patent (claims 1–2) on March 13, 2013 and issued a final written decision cancelling all claims of the '387 patent on March 10, 2014. The only claim the University appeals is claim 2. Any arguments as to the patentability of claim 1 are waived.

The claims of the '387 patent are directed to a semiconductor device and recite i) the existence of deuterium at the interface between a conductive silicon layer and a gate oxide (insulating) layer and ii) an improvement in resilience or lifetime. *See, e.g.*, '387 patent, claims 1–2. (A118.) The Board found all claims of the '387 patent unpatentable as obvious over Lisenker as a primary reference, or in combination with other prior art. On appeal, however, the University ties all of its arguments to claim 2

4

of the '387 patent, which unlike claim 1, quantifies the "practical lifetime" improvement as "ten times." Thus, the parties do not dispute that Lisenker discloses the existence of deuterium at the interface or that Lisenker discloses an improvement in resilience/lifetime. The primary issue on appeal (among others) is narrow. It is simply whether Lisenker alone or in combination with other art discloses or renders obvious this 10-fold lifetime improvement.

While the University appeals only claim 2, the University did not separately argue for the patentability of claim 2 to the Board. The University made a common argument for patentability to the Board that ran across both claims of the '387 patent. The University's prior arguments to the Board, below, can be summed up as follows:

i)   while Lisenker discloses passivating semiconductor devices in deuterium, it does not disclose post-metal passivation; (*see e.g.*, University's Patent Owner Response at A2619)

ii)  post-metal passivation in deuterium results in deuterium at the interface, which in turn results in a 10-fold lifetime improvement; (*see e.g.*, University's Patent Owner Response at A2625)

iii) on the other hand, pre-metal passivation does not result in deuterium at the interface because subsequent thermal processing causes the deuterium to migrate away from the interface; (*see e.g.*, University's Patent Owner Response at A2618) and

  iv)  because Lisenker only discloses pre-metal passivation, it cannot disclose (or enable) the existence of deuterium at the interface or the attendant 10-fold lifetime improvement.  (*See* University's Patent Owner Response at A2618–20.)[6]

The Board disagreed.  The University did not seek rehearing.  This appeal followed.

  Intrinsic to the University's argument is the logical relationship between post-metal passivation, deuterium at the interface, and the 10-fold semiconductor lifetime improvement.  According to that logic, a post-metal passivation step during the semiconductor manufacturing process (sometimes referred to as the VLSI process) is sufficient to achieve deuterium retained at the interface between a conductive silicon layer and a gate insulating layer.  That retained deuterium is sufficient to achieve the 10-fold lifetime improvement.  Thus, according to the University, a post-metal passivation step is sufficient to achieve the 10-fold lifetime improvement.  What is more, ***the University explicitly stated that the 10-fold lifetime improvement "resulting from post-fabrication passivation . . . is [] implied by the claimed post-fabrication process step."*** (A2625–26, University Patent Owner Response.)  The University's entire argument below, therefore, was premised on Lisenker's failure to disclose post-metal passivation—an argument which the Board rejected.  Indeed, the Board found that Lisenker teaches a semiconductor manufacturing process that

---

[6]  As explained below, the University also made this argument during the original prosecution of the '204 patent.

includes a post-metal deuterium passivation step.  (A64–66.)  Because Lisenker

teaches this step, the Board found that it inherently teaches an increased resilience to

hot electron effects, which results in increased resilience evidenced by "longer device

lifetimes." (A66–68.)

On appeal, the University switches its story.  Now, it concedes that Lisenker

discloses post-metal passivation in deuterium and the existence of deuterium at the

interface.  Yet it challenges the Board's finding that the 10-fold lifetime improvement

is inherent in Lisenker's teachings.  Thus, it attempts to sever the previously admitted

relationship between post-metal passivation, deuterium at the interface, and the 10-

fold lifetime improvement.  This relationship, however, is supported by the disclosure

of the '387 patent, the University's arguments made during original prosecution and

the *inter partes* review below, and the evidentiary record such that the Board's

conclusion is supported by substantial evidence.

## COUNTERSTATEMENT OF FACTS

Because the University's selective recitation of facts omits key evidence and testimony that are pertinent to the appeal issues, Micron sets forth the following counterstatement of facts.

## I.    The '387 Patent

The '387 patent "relates to methods for treating semiconductor devices or components thereof in order to reduce the degradation of semiconductor device characteristics over time." (A115 – '387 patent, 1:6–9.)  According to the '387 patent, this is accomplished by treating a semiconductor device by passivating (*i.e.*, annealing) the device with deuterium instead of hydrogen.  (A115 at 2:19–22.)  In the words of the '387 patent:

> [T]reatment with deuterium provides a reduction in the depassivation or "aging" of semiconductor devices due to hot carrier effects. Such aging is evidenced, for example, by substantial degradations of threshold voltage, transconductance, or other device characteristics. In accordance with the present invention, semiconductor devices are fabricated using deuterium to condition the devices and stably reduce the extent of these degradations.

(A116 at 3:22–30.)

The '387 patent further explains that the passivation step can occur during or after completion of fabrication.  (A116 at 4:28–31 ("In accordance with the invention, the semiconductor device will be treated with deuterium during or after completion of fabrication so as to condition the device to improve its operating characteristics.").)  The '387 patent also discloses that the substitution of deuterium for hydrogen will

8

result in a lifetime improvement by a factor of ten to fifty. *Id.*, (A113–14, Figs. 2–3;

A117 at 5:44–49 ("[D]ramatic decreases in the degradation of threshold voltage and

transconductance are observed when deuterium is used to passivate the devices, as

compared to hydrogen passivation (see FIGS. 2 and 3, respectively). These decreases

represent ***practical lifetime improvements by factors of about*** ***ten*** ***to*** ***fifty*** . . . .")

(emphasis added); A118 at 7:38–8:2 ("[T]ransistors sintered in deuterium typically

exhibit lifetimes 10 times longer than those sintered in hydrogen.").) The Board

noted this disclosure and determined, as a factual matter, that the experimental data in

the '387 patent specification links lifetime extension (including the ten to fifty times

semiconductor lifetime improvement noted in Figures 2–3) to ***deuterium***

***passivation in general***. (A58–59.) According to the Board, the experimental data

does not link semiconductor lifetime extension to just a post-metal passivation step,

as opposed to a pre-metal passivation step. *Id.*

## II.    The '387 Patent in View of the Related '204 Patent Prosecution

The University's deuterium passivation patents cannot each be considered in a

vacuum, as a "patentee's statements made during the prosecution of a later patent

[are] relevant to an earlier issued patent that share[s] a common specification." *Apple*

*Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312 (Fed. Cir. 2014) (citing *Microsoft Corp. v. Multi–*

*Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004)). The specification of the '387

patent is substantially identical to that of the '204 patent.

During prosecution of the later '204 patent, the University relied upon a declaration of its expert, Dr. Wallace, to gain allowance.[7]  In that declaration, Dr. Wallace argued that Lisenker's key deficiency was its failure to disclose post-metallization annealing.  In Dr. Wallace's view, the post-metal deuterium anneal of the '204 patent produced a 10-fold semiconductor device lifetime improvement that was unanticipated by the device community, whereas pre-metallization annealing does not.

> The Examiner states in the Office Action "Applicants have not shown that annealing post-metallization in deuterium is critical or has unexpected results relative to pre-metal annealing in deuterium (*i.e.*, Lisenker)." I must respectfully disagree.
> The data presented in the Lyding and Hess specification (pages 21-23 "ANNEALING RUNS" together with Figs. 2 and 3) ), **indicate at least an order of magnitude improvement in device performance** - well beyond that taught or anticipated by Lisenker.

(A2551 at ¶ 12.)  Thus, the University's prosecution expert (the same expert it used during the *inter partes* review) clearly tied an "order of magnitude improvement in device [lifetime] performance" (at least 10x) with a post-metallization anneal in deuterium semiconductor device fabrication step.  *Id.*

Dr. Wallace also testified that post-metallization annealing is critical because it is the only process that results in the retention of deuterium at the interface.

> Taken together, these studies demonstrate that the *retention* of deuterium at the interface necessarily requires the deuterium annealing of the device to be done at a point in the process which precludes the possibility of subsequent migration of deuterium from the gate insulator/semiconductor interface. As such, the recognition of *post-*

---

[7]    Dr. Wallace was the University's expert during both the prosecution and the later *inter partes* review.

*fabrication anneals* in a deuterium ambient uniquely fulfills this requirement.

(A2553 at ¶ 13 (emphasis in original).)

Dr. Wallace also testified that the 10-fold lifetime improvement corresponded to the retention of deuterium at the interface, resulting from the device's annealing history (*e.g.*, a post-fabrication anneal in deuterium).

> There have been studies, performed after the original reports by Lyding and coworkers, which have demonstrated that the *retention* of deuterium, and the corresponding *orders of magnitude improvement* in device reliability, depends critically upon the annealing history of the device.

(A2552 at ¶ 13 (emphasis in original).)

Dr. Wallace admitted, however, that a step of "post metal hydrogen annealing had been in widespread use in the semiconductor industry for many years." (A2554 at ¶ 15 (citing S. Wolf, "Silicon Processing for the VLSI Era" (Lattice, Sunset Beach, CA, 1995), Vol. 3, p425, 428.).)

## III.   The Prior Art

### A.   Lisenker

Lisenker discloses "a method for producing semiconductor devices in which hydrogen-containing bonds in silicon dioxide are replaced with deuterium containing bonds. Specifically Si-H bonds are replaced with Si-D bonds and Si-OH bonds are replaced with Si-OD bonds." (A2505–06 at 5:36–6:3.) Lisenker states that this

method can be accomplished by substituting deuterium for hydrogen at any stage of the VLSI process.[8]  (A2504 at 4:20–34; A2505 at 5:6–9; A2508 at 8:29–35.)

Lisenker, like the '387 patent, discloses that the substitution of deuterium for hydrogen results in deuterium at the interface.  For example, Lisenker discloses:

> The regions where the deuterated bonds provide the greatest benefit in terms of device performance is at the interface of silicon-silicon dioxide layers. Thus, the semiconductor devices of this invention will have at this interface a ratio of Si-OD plus Si-D bonds to Si-OH plus Si-H bonds that is substantially greater than ratio of naturally occurring deuterium to hydrogen.

(A2510 at 10:29–35; *see also* A2512 at 12:15–17 (Lisenker's claim 3: "The semiconductor device of claim 2 wherein the ratio of Si-OD plus Si-D bonds to Si-OH plus Si-H bonds is greater than about 99:1.").)

Lisenker, like the '387 patent, discloses that the presence of deuterium (rather than hydrogen) at the interface results in improved device lifetime.

> The stability of oxide layers is improved in the present invention because the bond energy of the Si-H and Si-OH bonds is increased by replacing the hydrogen atoms with deuterium atoms. The Si-D and Si-OD bonds thus formed provide completed silicon dangling bonds that are less likely to break when exposed to electrical stresses. Therefore, the deuterium containing devices of the present invention have improved stability, quality, and reliability.

(A2503–04 at 4:35–5:5.)

---

[8]    It is undisputed that a post-metal annealing step is part of the VLSI process. (A65-66; *see also* A12; A35–36 (related findings as to Lisenker's discussion of the VLSI process in the Final Written Decisions for the *inter partes* reviews of the other two related University patents).)

Moreover, Micron's expert, Dr. Reed, testified that another prior art reference, Mikawa[9], evidenced tests to compare the effects of substituting deuterium for hydrogen and recognized a lifetime improvement consistent with the 10-fold improvement claimed by the '387 patent.

> Mikawa also considered the large isotope effect of deuterium and examined its effects on the Si/SiO$_2$ interface. Mikawa examined the structural damage at the Si/SiO$_2$ interface caused by the injection of hot electrons in MOS devices. Mikawa observed that such electron injection generates interface states at the Si/SiO$_2$ interface. In one of the tests, Mikawa annealed samples in deuterium at 450°C to compare hydrogen passivation with deuterium passivation. Mikawa observed less electron trapping at the Si/SiO$_2$ interface of the samples annealed in deuterium than the otherwise identical samples that were annealed in hydrogen. Mikawa attributed such results to the well-known large isotope effect of deuterium. ***Mikawa states that "room temperature reaction rates involving hydrogen bond breaking events are frequently reduced by an order of magnitude when hydrogen is replaced by its heavier stable isotope, deuterium." Mikawa's observations are consistent with the 10X improvement in device lifetime characteristic claimed by the '387 patent***.

(A2230 at ¶¶ 32–33 (internal citations omitted) (emphasis added); *see also* A2751 at ¶ 10; A2945 - Mikawa.)[10] Dr. Reed testified that a person of ordinary skill in the art at the time of invention of the '387 patent would have interpreted Lisenker in view of Mikawa's teaching and would have understood that an order of magnitude (at least

---

[9]    (A2942–47 (R.E. Mikawa & P.M. Lenahan, Electron Spin Resonance Study of Interface States Induced by Electron Injection in Metal-Oxide Semiconductor Devices, 59 (6) J. Appl. Phys. 2054 (Mar. 15, 1986)).)

[10]    Micron's expert also explained that the "bond breaking" referred to by Mikawa is the mechanism that causes device degradation and, therefore, a reduction in bond breaking events directly corresponds to a lifetime improvement. (A2220–22 at ¶¶ 12–14.)

10x) improvement in semiconductor lifetime would occur by employing Lisenker's teachings.

Dr. Reed also testified that Lisenker discloses representative values of molecular bond energies of hydrogen- and deuterium-containing bonds and that from these values it is possible for one of skill in the art to estimate relative rates of bond-breaking reactions, which correlate to the lifetime of the device. Given these values, Dr. Reed derived the corresponding difference in rates at room temperature and determined the difference for the Si-H and Si-D bonds is approximately 3.9 and the difference of the O-H and O-D bonds is approximately 35. (A2225–29 at ¶¶ 20–29.) Dr. Reed concluded that these results (correlated to an estimated lifetime improvement between 3.9x and up to 35x) were also consistent with the disclosure of the '387 patent. (A2228–29 at ¶ 29.)

## B. Deal

Deal discloses a field effect transistor with an interface between a semiconductive silicon layer and a gate oxide layer. (A2526, Deal at 9:54–56.) Deal further discloses a post-metal passivation step in hydrogen. (A2526 at 9:33–53.)

## IV. The Board's Findings

### A. Product-By-Process Claim Format

The Board determined that claim 2 must be given product-by-process treatment, such that claim 2 requires deuterium at the interface, "but it does not require any specific process that results in deuterium at the interface." (A59.) At oral

argument, the University conceded that the Board's claim construction requiring

product-by-process treatment was sound.  (A2903 at 27:2–9.)  Because the process

steps of product-by-process claims are not considered for purposes of patentability—

the Board found that a 10-fold semiconductor lifetime improvement need not be

considered for purposes of patentability.  (A57–59; *see also* A2589–90, Notice of

Institution at 11–12.)

## B.     The Lisenker Prior Art Reference

The Board found, as a factual matter, that Lisenker discloses retention of

deuterium at the interface of the semiconductive silicon layer and a gate oxide layer.

(A67).  The Board also determined that Lisenker expressly and inherently discloses an

increased resilience to hot electron effects.  (A67–68.)  In addition, the Board found

that Lisenker "teaches the use of deuterium-as opposed to using hydrogen

'throughout the VLSI fabrication procedure.'" (A64–65 (citing A2508, Lisenker at

8:29–30).)  The Board thus rejected the University's argument that Lisenker was

limited to a pre-metal passivation.  (A65.)  It stated that "Lisenker includes numerous

additional teachings that undermine the University's argument that Lisenker's use of

deuterium is limited to pre-metallization passivation." *Id.*

The Board also found—specifically regarding claim 2—that Lisenker "teach[es]

the subject matter of claims 1 and 2 except for an express teaching of a gate oxide

layer that comprises silicon oxynitride."  (A62.)  The Board, nevertheless, credited the

testimony of Micron's expert "that, in light of at least Hwang, it was well known that

silicon oxynitride was a suitable material that could be used as the gate insulating layer, and that it would have been obvious to substitute the silicon oxynitride of Hwang for the silicon dioxide layers disclosed by Lisenker." *Id* (citing A2232–33, Dr. Reed Declaration at ¶¶ 37–38).

### C.    The Deal Prior Art Reference

The Board considered Deal both as a combinatory prior art reference and as a primary prior art reference.  In the combination of Lisenker in view of Hwang and Deal, the Board found that Deal expressly taught a post-fabrication passivation step in hydrogen, which the University did not dispute.  (A68.)  The Board credited Micron's expert's testimony that one of ordinary skill in the art would be motivated to combine Deal with Lisenker (as modified by Hwang) because Deal is directed to improving device quality.  *Id.*  It found such a combination would result in the substitution of deuterium for hydrogen in the hydrogen post-fabrication passivation step taught by Deal.  *Id.*  The Board further noted that the University failed to argue against unpatentability as to this ground aside from its arguments based on Lisenker and Hwang (which had been rejected) such that even if claim 2 requires a post-fabrication anneal in deuterium, that subject matter is obvious over Lisenker in view of Hwang and Deal.  *Id.*

The Board also considered Deal as a primary reference, in combination with Hwang and Lisenker.  It credited Micron's position that Deal teaches the semiconductive field effect transistor of claim 2, noting no dispute by the University.

(A69.)  It further credited Micron's position that it would be obvious to substitute the silicon oxynitride layer of Hwang with Deal's silicon dioxide layer and that the teachings of Hwang were not disputed.  *Id.*  The Board also agreed that Lisenker's teaching of substituting deuterium for hydrogen could be combined with Deal's hydrogen post-fabrication passivation step, crediting Micron's expert's testimony. (A70.) (citing Dr. Reed Declaration, A2239 at ¶ 50.)   The Board noted that the University failed to argue against this combination aside from its unpersuasive arguments regarding the combination of Lisenker and Hwang.  (A70.)  Thus, the Board concluded that even if claim 2 required a post-fabrication passivation (which it does not in view of the Board's product-by-process claim construction), that subject matter was obvious over Deal in view of Hwang and Lisenker.  *Id.*

# INTRODUCTION

The University, saddled with needing to surmount three obviousness findings against claim 2, uses this appeal to switch horses mid-stream. It previously attacked the prior art for an alleged failure to disclose post-metal passivation in deuterium, which, according to the University, was the key distinguishing feature of its patent. Having lost that issue, it now seeks to sever what it previously admitted as the inherent relationship between post-metal deuterium passivation, retention of deuterium, and a ten-times "practical lifetime" improvement. The University's new position, however, is contrary to the arguments it and its expert made during both prosecution and the *inter partes* review below.

The '387 patent discloses a method of annealing/passivating a semiconductor device during the manufacturing process in an ambient comprising deuterium. The specification teaches that devices annealed in deuterium will exhibit a ten-to-fifty-times increase in lifetime performance over the same devices annealed in hydrogen. The specification, however, makes no distinction between the use of pre-metal versus post-metal deuterium passivation in achieving the lifetime improvement, such as the 10-times improvement of claim 2. (*See* A113–14, Figs. 2–3; A117 at 5:44–49; A118 at 7:37–8:2; A2625 ("the experimental data included in the specification of the '387 patent, results in a functional difference expressed in a lifetime extension of the device of between 10 and 50 times.").)

Passivation of semiconductor devices (including post-fabrication passivation) in hydrogen was a known process in the art well before the University's patent. (University's expert's Declaration, A2554 at ¶ 15.)  This semiconductor fabrication processing step was understood to achieve greater device lifetime performance by tying off "dangling bonds" present at interface between the semiconductor and insulator layers.  Such dangling bonds contribute to "hot electrons," which reduce device performance through increased device degradation.

Lisenker—the key prior art reference at issue—described the problems of semiconductor degradation due to these hot electrons and proposed a solution to this long-standing problem.  (A2504 at 4:2–7.)  Particularly, Lisenker disclosed that semiconductor stability, quality, and reliability could be improved by substitution of deuterium for hydrogen "in many or all of the fabrication steps that would normally employ hydrogen."  (A2505 at 5:1–9.)  Thus, Lisenker disclosed substituting deuterium for hydrogen at both pre-metal and post-metal semiconductor fabrication steps.  But Lisenker didn't stop there.  He further described a semiconductor device having both SI-OD and Si-D bonds at the interface, wherein the "ratio of Si-OD plus Si-D bonds to Si-OH plus Si-H bonds is greater than about 99:1."  (A2512, claim 3.) Clearly, Lisenker disclosed a semiconductor device structure having an interface that is saturated with deuterium bonds.

The University cannot run from the fact that the prior art discloses at least the same scope as the process and structure disclosed in the '387 patent specification.

Indeed, at every step of the way—both before the Board, and on appeal—the University has failed to articulate any difference between the patent at issue and the prior art.  For at least this reason, the claimed features of the '387 patent are inherent.

And even if not inherent, the University fails to address how the ten-times lifetime element of claim 2 is not obvious.  Nor does the University address why that claim element should even be considered for purposes patentability in view of the Board's determination that the claims are subject to product-by-process treatment.

The Court should thus affirm the Board's judgment rendering claim 2 of the '387 patent invalid.  That judgment is supported by substantial evidence.

## ARGUMENT

## V. The Board Relied on Substantial Evidence to Determine That the 10-Fold Semiconductor Lifetime Improvement is Inherently Disclosed in the Prior Art

Obviousness is a question of law based on underlying findings of fact. An obviousness analysis must be based on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness, if any. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). The teachings of a prior art reference are underlying factual questions in the obviousness inquiry. *See Para–Ordnance Mfg., Inc. v. SGS Imp. Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995).

"Whether a claim limitation is inherent in a prior art reference is a question of fact." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001). Accordingly, this Court reviews the Board's factual determinations regarding inherency for substantial evidence. *In re Sullivan*, 498 F.3d 1345, 1350 (Fed. Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). If "the evidence in [the] record will support several reasonable but contradictory conclusions," this Court "will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002).

### A. Substantial Evidence Supports the Board's Finding That Lisenker Inherently Discloses the 10-Fold Improvement Because Lisenker Teaches the Identical Process and Structure Disclosed by the '387 Patent

As noted above, the University does not dispute that Lisenker discloses i) passivation in deuterium (both pre- and post-metal) and ii) that such annealing results in deuterium at the interface. *See* Blue Br. at 8 ("Lisenker teaches the use of pre- and post-metallization annealing…"). Thus, patentability (if at all) of claim 2 must be based on its recitation of ". . . to provide to said transistor a practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen gas. . . "

### 1. According to the '387 patent, a 10-times semiconductor lifetime improvement derives from deuterium retained at the interface from deuterium passivation.

Both the '387 patent and the University agree that the 10-fold semiconductor lifetime improvement is the necessary result of the retention of deuterium at the interface between the semiconductive silicon layer and a gate oxide layer through a post-metal deuterium passivation step. (A116 at 3:22–30; A2625, University's Patent Owner Response ("the experimental data included in the specification of the '387 patent, results in a functional difference expressed in a lifetime extension of the device of between 10 and 50 times.").) Indeed, neither the '387 patent nor the University offer any other explanation for how such a lifetime improvement is achieved. (*See* A113–14, Figs. 2–3; A117 at 5:44–49; A118 at 7:37–8:2; A2625, University's Patent Owner Response (arguing that "[the '387 patent] claim language requires improved

resistance to hot carrier effects **resulting from** retention of deuterium at the silicon/insulator interface **resulting from** post-fabrication passivation using deuterium… that improved resistance… results in a functional difference expressed in a lifetime extension of the device of between 10 and 50 times") (emphasis added); *see generally*, Blue Br.)  Nor does the '387 patent claim or otherwise describe, for example, any specific amount or concentration of deuterium that must be retained at the interface to achieve a lifetime improvement.[11]  The only explanation provided by the patent for the claimed semiconductor lifetime improvement is that it results from retention of deuterium at the interface.  (*See* A113–14, Figs. 2–3; A117 at 5:44–49; A118 at 7:37–8:2.)

The '387 patent also discloses that the way deuterium is retained at the interface is by way of a passivation step in deuterium.  (*See, e.g.,* A116 at 4:28-36.)  Because,

---

[11]     During prosecution of the related '204 patent, the University invoked an interference in an attempt to gain claims directed toward a semiconductor device having a specific concentration of deuterium, where that concentration was claimed to "substantially reduc[e] said degradation associated with hot carrier stress." (A1308, claim 66.)  In remarks to the Examiner, the University specifically stated that the claimed concentration of deuterium was an inherent result of the annealing process described by its application.  (A1312 (The feature of the proposed count and new claim 66 that the concentration of deuterium resulting from the disclosed annealing process is "at least about $10^{16}$ cm$^{-3}$" **is a result of the particular annealing process** described in those  applications **and thus is inherently disclosed by each of those applications** . . . .".)  Going further, the University explained that inherency is "demonstrated because the effect of the deuterium content as recited in the count ("said concentration of deuterium substantially reducing said degradation associated with said hot carrier stress) is the same as explicitly disclosed in both of these applications." (A1312–13.)  The interference was not initiated, however, because the Examiner determined the University lacked written description support in its application for the claimed concentration.  (A1376.)

according to the '387 patent, deuterium passivation results in deuterium at the interface, the '387 patent confirms that the 10-fold lifetime improvement necessarily results from deuterium passivation when compared to the prior art method using hydrogen. (A113–14, Figs. 2–3; A117 at 5:44–49 ("[D]ramatic decreases in the degradation of threshold voltage and transconductance are observed when deuterium is used to passivate the devices, as compared to hydrogen passivation …. These decreases represent practical lifetime improvements by factors of about ten to fifty ….."); A118 at 7:37–8:2 ("[T]ransistors sintered in deuterium typically exhibit lifetimes 10 times longer than those sintered in hydrogen."). This result is achieved because the post-metal deuterium anneal results in deuterium bonds at the interface. (*See e.g.*, A2553 at ¶ 13, Declaration of the University's expert, Dr. Wallace; *see also* A67.) The '387 patent does not disclose or claim any other mechanism, condition, or any other factor that is responsible for providing this improved lifetime, and the University fails to argue otherwise.

While the '387 patent teaches that both pre- and post-metal passivation in deuterium results in a 10-fold lifetime improvement (as discussed in more detail in Section V.A.2), the University has argued to the Board that post-metal passivation necessarily results in this 10-fold improvement. The University's argument at the very least confirms the necessary tie between deuterium post-metal passivation and the 10-fold lifetime improvement. The University argued to the Board that even though the claims of the invention were written in product-by-process form, the recited post-

24

fabrication process passivation in deuterium step should be considered for patentability because it "implie[s]" a ten to fifty-fold difference:

> It is clear from the foregoing that, during prosecution of the patents, the University undertook great efforts to distinguish the subject invention from the prior art based upon this **ten to fifty-fold difference resulting from post-fabrication passivation using deuterium. In light of the forgoing authority, it is of no moment that this difference is only implied by the claimed post-fabrication process step**, rather than appearing expressly as a claim limitation. Rather, this substantial difference mandates that such claimed post-fabrication passivation step be considered in determining the patentability of the subject claims.

(A2625–26) (emphasis added).

But that is not all. At oral argument, the University maintained this argument. For example, in response to Judge Fitzpatrick's question regarding Lisenker's disclosure of a semiconductor device having a ratio of 99:1 deuterium to hydrogen bonds at the interface, the University attempted to draw a contrast to the prior art, emphasizing that

> "They're [the claims] directed to how you get to the useful
>
> life, **10-fold, 50-fold,** whatever it is **through the use of a**
>
> **post-fabrication passivation step**."

(A2916, 40:9–19.) (emphasis added) The University thus admitted that the claimed 10-fold lifetime improvement is achieved through a post-fabrication passivation step, and nothing more. Consistent with that line of argument, the following exchange occurred:

**JUDGE MOORE:** . . . Is it your opinion that having the post-fabrication step will result in the improvements that are claimed? In other words, are those two things tied together or are there ways to have the post-fabrication step but still not achieve the increased resistance that you say -- the increased life that you say is required?

**MR. SUMMERFIELD:** Well, I think the way I would characterize my answer is that as long as you're practicing all the limitations of the claims. . . . But if the limitations of the claims aren't *[sic]* practiced, including post passivation, then **there is no way to avoid getting the kind of increased life that the claims call for.**

(A2916 at 40:23–A2917 at 41:10.) Yet again, according to the University, a post-fabrication passivation in deuterium is what leads to the claimed increased lifetime.

The University made these arguments in an attempt to overcome Lisenker, which it argued did not disclose a post-fabrication (or "post-metal") passivation step. The Board disagreed, finding that Lisenker explicitly disclosed such a passivation step; a finding that the University does not appeal. *See* Blue Br. at 8 ("Lisenker teaches the use of pre- and post-metallization annealing…"). In short, the University agreed that post-fabrication passivation in deuterium necessarily results in a 10-fold improvement. Only on appeal does the University contend otherwise.

26

As discussed in the following section, the Board found that Lisenker explicitly teaches deuterium at the interface. (A2510 at 10:29–35.) Indeed, Lisenker goes further and teaches deuterium retained at the interface at a ratio of 99 to 1 of deuterium bonds to hydrogen bonds. (A2512 at 12:15–17.) The Board also found that Lisenker teaches the use of a pre- and post-metal deuterium passivation step. (A2508 at 8:29–35 (deuterium use throughout the VLSI process)). According to the '387 patent, these requirements result in a 10-fold semiconductor lifetime improvement. Thus, substantial evidence supports the Board's determination that the claimed semiconductor lifetime improvement is necessarily taught by—and an inherent result of—Lisenker.

> 2.    Lisenker discloses the same operative structure and process that the '387 patent discloses.

The '387 patent's disclosure regarding how a 10-fold lifetime improvement is achieved does not extend beyond that of Lisenker's disclosure. Both teach identical processes and resulting structure. Therefore, to the extent the '387 patent discloses a 10-fold lifetime improvement, so must Lisenker. It is well established that the "the prior art need only meet the inherently disclosed limitation to the extent the patented method does." *King Pharm., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1275–76 (Fed. Cir. 2010) ("Because the '128 patent discloses no more than taking metaxalone with food, to the extent such a method increases the bioavailability of metaxalone, the identical prior art method does as well."); *In re Kao*, 639 F.3d 1057, 1070 (Fed. Cir.

2011) ("Substantial evidence supports the Board's finding, based upon the specification, which confirms that the claimed "food effect" is an inherent property of oxymorphone itself, present both in controlled release and immediate release formulations of that drug."); *In re Kubin*, 561 F.3d 1351, 1357 (Fed. Cir. 2009) ("[e]ven if no prior art of record explicitly discusses the [limitation], the [patent applicant's] application itself instructs that [the limitation] is not an additional requirement imposed by the claims on the [claimed invention], but rather a property necessarily present in the [claimed invention].").[12]

Here, just like in the cases cited above, Lisenker discloses all of the ingredients that, according to the '387 patent, are necessary to achieve a 10-fold semiconductor lifetime improvement. In other words, the respective disclosures of the '387 patent and Lisenker are at least commensurate in scope. Both disclose the same process (substituting deuterium for hydrogen in the pre- and/or post-metal passivation step), the same structure (deuterium at the interface), and the resulting benefit (that substituting deuterium for hydrogen results in improved semiconductor device resilience manifested in a lifetime improvement). (*Compare* '387 patent, A115 at 2:19–

---

[12]     This Court's opinion in *In re Glaug*, 283 F.3d 1335, 1341–1342 (Fed. Cir. 2002) (on which the University relies) does not instruct otherwise. In *In re Glaug*, this Court found that the prior art did not disclose the benefit (a reduction in the loss of elasticity) because the prior art did not disclose the claimed structure (spaced zones of adhesive) from which the benefit was derived. Because the University does not dispute that Lisenker discloses the claimed structure (*i.e.*, deuterium at the interface), its reliance on *In re Glaug* is simply misplaced.

22; A116 at 3:22–30; 4:28–31;  A113–14, Figs. 2–3; A117 at 5:44–49; A118 at 7:37–8:2 *with* Lisenker, A2504 at 4:20–34; A2504–05 at 4:35–5:5; A2505 at 5:6–9; A2505–06 at 5:36–6:3; A2508 at 8:29–35; A2510 at 10:29–35; A2512 at 12:15–17.)

Specifically, both disclose the use of pre- and post-metal deuterium passivation by teaching that the invention involves either (or both).  (*Compare*,  A116 at 4:28–31, 4:36–43, 4:44–49 *with* A2508 at 8:29–35 (deuterium use throughout the VLSI process).)  This much was confirmed by the University's expert (A2796 at 130:1–9 (testifying that the '387 patent describes treating a device with deuterium using pre- or post-metal passivation steps),) and not challenged by the University on appeal.  *See generally*, Blue Br.[13]

Also, both the '387 patent and Lisenker disclose the same resulting structure— a semiconductor device having deuterium at the interface.  For example, Lisenker discloses:

> The regions where the deuterated bonds provide the greatest benefit in terms of device performance is at the interface of silicon-silicon dioxide layers. Thus, the semiconductor devices of this invention will have at this interface a ratio of Si-OD plus Si-D bonds to Si-OH plus Si-H bonds that is substantially greater than ratio of naturally occurring deuterium to hydrogen.

(A2510 at 10:29–35; *see also* A2512 at 12:3–9, 15–17 (Lisenker claim 3: "The semiconductor device of claim 2 wherein the ratio of Si-OD plus Si-D bonds to Si-OH plus Si-H bonds is greater than about 99:1.").  There is no dispute that the

---

[13]     The University argued at the Board that Lisenker did not disclose a lifetime improvement.

retained deuterium at the interface is the sole structure responsible for the semiconductor lifetime improvement. Therefore, to the extent the '387 patent concludes that passivation in deuterium results in deuterium at the interface, which in turn results in a 10-fold improvement, those same benefits must necessarily result from Lisenker's disclosure. *Kao*, 639 F.3d at 1070 (determining that the Board's inherency decision was supported by substantial evidence where the patentee claimed a maximum concentration of "50% higher" when drug dosages were given on a full stomach, which the patent taught was a property of the drug itself).

### 3. The prior art's inherent teachings are not defeated by alternatively-taught embodiments.

To the extent the University faults Lisenker's teaching of both pre- and post-metal deuterium anneal steps—the prior art's description of alternative embodiments does nothing to alter the inherent teachings of the reference. (Blue Br. at 8, 10–11.) Lisenker, as the Board determined, clearly discloses a post-metal deuterium anneal step. It matters not one bit whether Lisenker is "agnostic," (Blue Br. at 7) between use of pre- or post-metal passivation steps, or both. *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1348–49 (Fed. Cir. 1999) (holding that the prior art still inherently taught the "key aspect of Dr. Clay's alleged invention" even though certain embodiments encompassed within the disclosed "broad range" might not perform this "key aspect"). Further, if the University's complaint boils down to Lisenker not explicitly stating "a ten-times lifetime improvement," "an insufficient scientific understanding

does not defeat a showing of inherency." *Id.* at 1349. Such an argument should be disregarded, however, where—as here—the '387 patent fails to identify any allegedly different structure or process from that which is already described by Lisenker.

> 4. The Board did not err in referencing the teachings of the '387 patent specification as to inherency.

It is of no moment that the University faults the Board for relying on the '387 patent specification for evidence of inherency. (Blue Br. at 6–7, 11.) The Board is entitled to take the University's patent at its word, particularly where the '387 patent discloses no more than the prior art. This Court has affirmed the Board's inherency determinations based on the exact same reasoning in several circumstances. *Kao*, 639 F.3d at 1070 ("Substantial evidence supports the Board's finding, based upon **the specification**, which **confirms that the claimed "food effect" is an inherent property of oxymorphone itself**, present both in controlled release and immediate release formulations of that drug.) (citing *Kubin*, 561 F.3d at 1357) (stating "[e]ven if no prior art of record explicitly discusses the [limitation], **[applicant's] application itself instructs that [the limitation] is** not an additional requirement imposed by the claims on the [claimed invention], but rather **a property necessarily present in [the claimed invention]**")) (emphasis added).

> 5. Merely measuring and claiming an existing characteristic result of a known process does not make the result patentable.

Another line of cases is instructive. This Court has repeatedly warned that "[n]ewly discovered results of known processes directed to the same purpose are not

patentable because such results are inherent." *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1376–77 (Fed. Cir. 2001) (internal citations omitted); *see also Abbott Labs. v. Baxter Pharm. Prods.*, 471 F.3d 1363, 1368–69 (Fed. Cir. 2006); *Brassica Prot. Prods. LLC v. Sunrise Farms (In re Cruciferous Sprout Litig.)*, 301 F.3d 1343, 1350–51 & n. 4 (Fed. Cir. 2002).

The situation at hand is similar to *Bristol-Myers* and its progeny inasmuch as the 10-fold lifetime improvement is akin to a newly discovered result. But unlike the prior art in *Bristol-Myers*, Lisenker explicitly recognizes the result—a lifetime improvement. (A2505 at 5:4–5 ("[D]euterium containing devices of the present invention have improved stability, quality, and reliability."). The only arguably absent teaching is the extent or degree of such improvement. Thus, the 10-fold improvement is at most a newly discovered quantification of a characteristic of the result of the semiconductor fabrication process Lisenker teaches. Merely measuring a characteristic of a prior art process and claiming it does not provide grounds for patentability. *Kao*, 639 F.3d at 1072 (affirming holding of obviousness even where "the only claim element not expressly disclosed in the prior art was the previously-unknown, yet inherent, . . . property.").

In sum, the University is unable to identify a single process step or structure disclosed in the '387 patent but absent in Lisenker that would account for the claimed 10-fold semiconductor improvement. Thus, Lisenker must inherently disclose this claim element. (A67.) To the extent the University quibbles with the language of the

Board's opinion as lacking the terms "ten-times" and "inherent," in the same sentence, such an argument does not warrant vacatur, particularly where the Board's conclusions are supported under the standard of review by the evidentiary record. (*See* A67, Final Written Decision, ("**Longer device lifetimes** due to increased resilience to hot electron effects **is an inherent result** of greater deuterium retained at the interface") *but see In re Giuffrida*, 527 Fed. Appx. 981, 986 (Fed. Cir. 2013) (declining "to hold that the Board's obviousness findings were categorically improper" where the Board's "'path may reasonably be discerned,' even if '[i]ts conclusions [we]re cryptic, but ... supported by the record.'") (citing *In re Huston*, 308 F.3d 1267, 1280–81 (Fed. Cir. 2002) and *In re Applied Materials, Inc.*, 692 F.3d 1289 (Fed. Cir. 2012))).

### B.    Lisenker's Inherent Disclosure of the 10-Fold Improvement is Confirmed by the Evidentiary Record

1.    The prior art Mikawa reference experimentally confirms a 10-fold semiconductor lifetime improvement as a result of practicing Lisenker's post-metal deuterium passivation process.

Beyond Lisenker's explicit disclosure of annealing in deuterium resulting in retained deuterium at the interface (which according to the '387 patent necessarily results in a 10-fold lifetime improvement), other record evidence further establishes Lisenker's 10-fold lifetime improvement disclosure.  First, as Dr. Reed testified, another prior art reference, Mikawa, also disclosed tests comparing the effects of substituting deuterium for hydrogen.  (A2230-31 at ¶¶ 32–33; *see also* A2751–52 at ¶¶

10–11; A2945.)  Mikawa recognized that such a substitution yielded an order of

magnitude reduction in hydrogen bond-breaking events, which is consistent with the

same 10-fold lifetime improvement described by the '387 patent.  *Id.*[14]  Thus, prior art

teachings experimentally confirm that Lisenker inherently discloses the 10-fold

lifetime improvement.

> 2.    Evidence before the Board confirmed Lisenker's teaching of a 10-
> times semiconductor lifetime improvement.

Second, Dr. Reed testified that Lisenker discloses representative values of

molecular bond energies of hydrogen- and deuterium-containing bonds and that from

these values, one of skill in the art could estimate relative rates of bond-breaking

reactions.  The relative rate, "k," of a chemical reaction can be estimated through use

of the Arrhenius equation and correlated to the lifetime improvement of the device in

the context of deuterium substitution for hydrogen.  (A2226–27 at ¶ 23.)  Given the

molecular bond energy values disclosed by Lisenker, Micron's expert derived the

corresponding difference in rates at room temperature by applying the Arrhenius

equation and determined the difference in rates of bond breaking between the Si-H

and Si-D bonds is approximately 3.9 times longer for Si-D bonds and the difference

---

[14]    Dr. Reed also explained that the "bond breaking" referred to by Mikawa is the
mechanism that causes device degradation and, therefore, a reduction in bond
breaking events directly corresponds to a lifetime improvement.  (A2220–22 at ¶¶ 12–
14.)

between the O-H and O-D bonds is approximately 35 times longer for O-D bonds.[15]

(A2225–29 at ¶¶ 20–29.)  As Lisenker shows at Figure 1, the Si/SiO$_2$ interface

includes both Si-D and O-D bonds, when deuterium replaces hydrogen as the

annealing gas.[16]  (A2499.)



**(A2499, Figure 1 of Lisenker, with the O-D bonds annotated.)**

---

[15]    The University's brief and Statement of Facts on this point tell only half the story.  While it is true that the low end of the bond-breaking improvement estimate was 3.9 times, the University left out the full scope of Micron's expert's opinions. Indeed, Micron's expert testified that the upper end of the of the bond-breaking improvement estimate was 35 times—well beyond the 10-times lifetime improvement upon which the University relies.

[16]    During argument before the Board, the University falsely argued that OD bonds are not implicated by Figure 1 of Lisenker.  (A2907 (George Summerfield: "There's nothing in Figure 1 from Lisenker that implicates forming bonds with oxygen at all.  So why Dr. Reed felt compelled to look at the relative strengths between Si-O -- I'm sorry, SOH and OD bonds is beyond us, effectively.".)  Setting aside that this is attorney argument, unsupported by any testimony of even the University's expert, the University's argument is clearly rebutted by the existence of O-D bonds, as noted above in annotated Figure 1 and as claimed at Lisenker's claim 1. (A2499; A2512 at 12:3-9 (" . . . ***the interface having Si-OD*** and Si-D ***bonds***; wherein the ***ratio of Si-OD*** plus Si-D ***bonds*** to Si-OH plus Si-H bonds is substantially greater than ratio of naturally occurring deuterium to hydrogen.").)

Micron's expert concluded that these results for devices post-metal annealed in deuterium—correlated to an estimated lifetime improvement of ***at least 3.9 times and up to 35 times longer*** than post-metal annealed in hydrogen—were consistent with the '387 patent disclosure of a 10-times lifetime improvement.   (A2228–29 at ¶ 29.)  Thus, the teachings of Mikawa and Lisenker further establish that Lisenker inherently discloses a 10-fold lifetime improvement.  For this additional reason, substantial evidence supports the Board's finding that Lisenker inherently discloses a 10-fold lifetime improvement.

## VI.     Even if the 10-Fold Lifetime Improvement is not Inherent, the Board Relied on Substantial Evidence to Determine That it is Obvious

### A.     Lisenker in view of Hwang renders claim 2 obvious.

In its brief, the University does not identify a device structure or method step that is not explicitly disclosed in Lisenker.  Moreover, the University does not dispute that Lisenker explicitly discloses a device lifetime improvement.  *See generally*, Blue Br. The University's sole basis for patentability is that claim 2 of the '387 patent recites an improvement to a greater degree than that explicitly taught in the prior art.  In making its argument, however, the University conflates inherency (a form of anticipation) and obviousness.  This Court has made clear that arguments rebutting anticipation are not sufficient to rebut obviousness.  *See In re Baxter Travenol Labs.*, 952 F.2d 388, 391-92 (Fed. Cir. 1991) (dismissing patentee's argument regarding nonobviousness, which was "essentially the same argument advanced to rebut the anticipation rejection"

explaining that "[i]t is not the function of this court to examine the claims in greater detail than argued by an appellant, looking for nonobvious distinctions over the prior art.")  In other words, just because a claim element is not inherent does not foreclose a determination that it is nonetheless obvious. *See Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1345–55 (Fed. Cir. 2013) (agreeing with the Board that a claim element was not inherent in the asserted prior art, but concluding the Board erred in determining that the same element would not have been obvious).

Tellingly, the University does not argue why it would not have been obvious to a person of skill in the art to obtain an improved semiconductor lifetime (*i.e.*, the 10-fold improvement).  Indeed, achieving a lifetime improvement (*i.e.*, making high quality, stable, semiconductor devices) is the purpose of the prior art that was before the Board.  *See e.g.*, A2505 at 5:4–5 ("Therefore, the deuterium containing devices of the present invention have improved stability, quality, and reliability.").   In view of the teachings of the prior art such as Lisenker, it is not surprising that the University is unable to articulate why such an aspirational claim limitation is nonobvious.

As set forth in Section V.A.2, the 10-fold semiconductor lifetime improvement is at most a newly discovered quantification of a known characteristic.  Mere quantification cannot transform an obvious claim into one that is nonobvious. *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) ("an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations."); *Kao*, 639 F.3d at 1070 ("[The prior

art's] express teachings render the claimed ... formulation obvious, and the claimed [blood concentration] adds nothing of patentable consequence.").

Furthermore, even if the 10-fold lifetime improvement were not inherent in Lisenker (which it is), such a deficiency would not alter this conclusion. For example, even if it were agreed that Lisenker only teaches a 5-fold improvement, it is well-established that a change in only degree is a change that will not sustain a patent. *Application of Blondiau*, 181 F.2d 223, 225 (Cust. & Pat. App. 1950) ("As said so long ago by the Supreme Court in *Smith v. Nichols*, 21 Wall. 112, 88 U.S. 112, 119, 22 L.Ed. 566, 'a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent.'").

Whether the claimed improvement were 10-fold or 100-fold, the University cannot point to an optimum concentration of deuterium retained at the interface or any other characteristic of the structure or process disclosed by the '387 patent that would contribute to a lifetime improvement beyond that disclosed by Lisenker. The '387 patent simply fails to disclose such detail. Even if the University could identify a relevant disclosure, the measured 10-fold improvement would be the product of routine experimentation and not the product of invention. *Id.* at 225 ("Achievements which result from trial and error experimentation are the product of a routineer and not an inventor.") (citing *Rembert et al. v. Coe*, 136 F.2d 793 (D.C. Cir. 1943));

*Application of Aller*, 220 F.2d 454, 458 (Cust. & Pat. App. 1955) ("No invention is involved in discovering optimum ranges of a process by routine experimentation.").

### B. Lisenker in view of Hwang and Deal renders claim 2 obvious.

The same holds true for the other grounds the Board relied upon to find claim 2 obvious. For example, were there any question as to Lisenker's disclosure of post-metal passivation (which there is not), the Board found this step would have been obvious over Lisenker and Hwang, further modified by Deal.

> 1. Noting that Deal's teachings were undisputed, the Board properly combined Lisenker with Hwang and Deal to obviate claim 2.

The Board found that Deal expressly taught a hydrogen post-fabrication passivation step—a finding which the University did not dispute. (A68.) While the University now attacks this combination by arguing that the Board did not explain the motivation to combine these references, (Blue Br. at 12), that is a mischaracterization of the record. The Board specifically credited Micron's expert's testimony that one of ordinary skill in the art would have been motivated to combine Deal with Lisenker and Hwang because Deal is directed to improving device quality. (A68.) Such a combination results in the substitution of deuterium for hydrogen in the hydrogen post-fabrication passivation step taught by Deal. *Id.* The Board further noted that the University failed to argue against unpatentability as to this ground aside from its arguments based on Lisenker and Hwang (which had been rejected), such that even if

claim 2 requires a post-fabrication anneal in deuterium, that subject matter is obvious over Lisenker in view of Hwang and Deal. *Id.*

Given the University's concession that "Lisenker teaches the use of pre- and post-metallization annealing" (Blue Br. at 8) and its inability to dispute the motivation found in Deal, the University's argument that "there would have been no motivation for one of ordinary skill in the art reading Lisenker to have sought out other references teaching post-metallization annealing specifically" (*id.*) is without merit.

> 2.    The University's current argument against the combinability of Lisenker in view of Hwang and further in view of Deal is waived.

The University asserts that Lisenker and Hwang cannot be combined with Deal because Lisenker supposedly "fails to distinguish between pre- and post-metallization annealing in achieving the reported superior results." (Blue Br. at 12.) This argument is waived, because the University did not present it below. *In re Watts*, 354 F.3d 1362, 1367–68 (Fed. Cir. 2004) (declining to "consider the appellant's new argument regarding the scope of the" prior art "[b]ecause the appellant failed to argue his current interpretation of the prior art below" and "[the Court] do[es] not have the benefit of the Board's informed judgment on this issue for our review.") (citing *In re Berger*, 279 F.3d 975, 984 (Fed. Cir. 2002) and *In re Schreiber*, 128 F.3d 1473, 1479 (Fed. Cir. 1997)).

Before the Board, the University argued against the combination of Lisenker and Hwang with Deal, asserting its same prior arguments—essentially that "Lisenker

is limited to pre-metal annealing and, thus, results in no increase in deuterium at the interface." (*See* Final Written Decision at A68; *see also* University Patent Owner Response A2622–23.)  Now, the University argues not that Lisenker is limited to pre-metal annealing, but that Lisenker fails to distinguish between pre- and post-metal annealing.  (Blue Br. at 12.)  This new argument was not made below with respect to the combination of Lisenker and Hwang, or even Lisenker and Hwang in view of Deal.  It is thus waived.  The Board's opinion that claim 2 is obvious over Lisenker and Hwang or Lisenker and Hwang in view of Deal should thus be affirmed.

### C.     Deal in view of Hwang and Lisenker renders claim 2 obvious.

    1.     The University does not challenge the Board's factual findings.

The University does not challenge the Board's findings in determining claim 2 obvious over Deal in view of Hwang and Lisenker.  (Blue Br. at 12; Final Written Decision at A10; A17–19.)  It merely attacks the Board's decision for purportedly failing to "explain the motivation to combine these references."  (Blue Br. at 12.) But that is a false characterization of the record.

The Board extensively analyzed the reasons to combine Hwang and Lisenker's teachings with Deal.  For instance, as to Hwang's teachings, it credited Micron's expert's testimony that "it was well known that silicon oxynitride was a suitable material that could be used as the gate insulating layer, and that it would have been obvious to substitute the silicon oxynitride of Hwang for the silicon dioxide layers disclosed by Deal."  (A69, Final Written Decision (citing A2237–38, Dr. Reed

Declaration at ¶¶ 47–48).)  As to Lisenker's teachings, the Board credited Dr. Reed's testimony that it would have been "obvious to substitute deuterium for hydrogen in Deal's post-fabrication passivation step because "Lisenker suggests that 'any hydrogen containing material used in VLSI fabrication can be replaced with corresponding deuterium containing material.'"  (A70, Final Written Decision (quoting A2240, Dr. Reed Declaration at ¶ 50).)  Thus, the Board properly analyzed the motivation to combine all three prior art references and its decision rendering claim 2 obvious over Deal in view of Hwang and Lisenker should be affirmed.

> 2.    The University's challenge to Lisenker's teaching is irrelevant to how Lisenker is used in the combination of Deal in view of Hwang and Lisenker.

The University's argument that Lisenker "fails to distinguish between pre- and post-metallization annealing in achieving the reported superior results," (Blue Br. at 12,) is misplaced in the context of a combination of Deal in view of Hwang and Lisenker.  As a challenge to this particular combination, the University's argument is frivolous[17] because it was Deal—not Lisenker—which was relied upon in the combination of Deal in view of Hwang and Lisenker for a post-fabrication passivation teaching.  (A70.)  Deal's teachings are undisputed.  (*See generally*, Blue Br.) Lisenker, as the Board noted, was only relied upon by Micron (in the combination of

---

[17]    The University cannot possibly prevail over the combination of Deal in view of Hwang and Lisenker where, as here, the only argument it makes against the combination is as to a teaching of Lisenker for which the reference is not relied upon in this combination.

Deal in view of Hwang and Lisenker) for its suggestion to substitute deuterium for hydrogen in Deal's post-fabrication passivation step, since Lisenker teaches that any hydrogen containing material can be replaced with deuterium in the VLSI fabrication process. *Id* (citing Dr. Reed's Declaration, A2239 at ¶ 50.) Based on the evidence and arguments before it, the Board properly concluded that claim 2 "would have been obvious over Deal in view of Hwang and Lisenker." *Id.* Its judgment should be affirmed.

3.    The University's current argument against the combinability of Deal in view of Hwang and Lisenker is waived.

The University asserts that Deal cannot be combined with Hwang and Lisenker because Lisenker supposedly fails "to distinguish between pre- and post-metallization annealing in achieving the reported superior results." (Blue Br. at 12.) For much of the same logic presented *supra* with respect to the University's waiver of a motivation to combine challenge against Lisenker in view of Hwang and Deal, the argument challenging the combinability of Deal with Hwang and Lisenker is likewise waived. *See Watts*, 354 F.3d at 1367–68; *Berger*, 279 F.3d at 984; *Schreiber*, 128 F.3d at 1479.

To the Board, the University argued against the combination of Deal with Hwang and Lisenker, asserting its same prior arguments—essentially that "Lisenker is limited to pre-metal annealing and, thus, results in no increase in deuterium at the interface." (*See* Final Written Decision at A70; *see also* University Patent Owner Response A2623.) Now, the University argues **not** that Lisenker is limited to pre-

metal annealing, **but** that Lisenker fails to distinguish between pre- and post-metal annealing.  (Blue Br. at 12.)  This new argument was not made below with respect to the combination of Deal in view of Hwang and Lisenker.  It is thus waived.  The Board's judgment that claim 2 is obvious over Deal in view of Hwang and Lisenker should thus be affirmed.

### D.    A Change In Degree Is Not A Patentable Distinction

All of the aforementioned combinations unquestionably disclose a post-metal anneal in deuterium resulting in deuterium at the interface and (according to the '387 patent and the University's own arguments) a 10-fold lifetime improvement.  But even if the 10-fold improvement does not necessarily follow from the disclosures of the prior art, the question then is whether such an improvement would have been obvious.  As each of the prior art references in the aforementioned combinations sought to improve the quality and reliability of the semiconductor devices, substantial evidence supports a finding that the 10-fold improvement would have been apparent to one of skill in the art.  As set forth above, a change in only degree is a change that will not sustain a patent.  *Blondiau*, 181 F.2d at 225.  Prior art such as Mikawa, moreover, indicates to a person of ordinary skill in the art that substitution of deuterium for hydrogen would lead to a ten-time reduction in bond-breaking events, correlated to a ten-times semiconductor lifetime performance.  (A2230–31 at ¶¶ 32–33; *see also* A1969 at ¶ 10; A2945 – Mikawa; A2729, Micron Reply to University Patent Owner Response (discussing Mikawa's teachings); A2895 at 19:4–21, Micron's

44

Argument to the Board (same).)  Thus, the Board's obviousness findings with respect to claim 2 are supported by substantial evidence.

## VII.  The Board Did Not Err Because the 10-Fold Lifetime Improvement Must not be Considered for Purposes of Patentability

### A.  Product-by-Process Treatment of Claim 2 Removes the 10-Fold Lifetime Improvement From the Patentability Determination

"Product-by-process claims . . . enable an applicant to claim an otherwise patentable product that resists definition by other than the process by which it is made." *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985). "In determining validity of a product-by-process claim, the focus is on the product and not the process of making it." *Amgen Inc. v. F. Hoffman–La Roche Ltd.*, 580 F.3d 1340, 1369 (Fed. Cir. 2009). Thus, "[i]f the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."  *Thorpe*, 777 F.2d at 697; *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1317 (Fed. Cir. 2006) ("It has long been established that one cannot avoid anticipation by an earlier product disclosure by claiming ... the product as produced by a particular process."); *Thorpe*, 777 F.2d at 697 ("If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process.").

Claim 2 of the '387 patent claims a semiconductor device having deuterium at the interface between a semiconductive silicon layer and a gate insulating layer

manufactured according to a specific process (*i.e.*, post-fabrication passivation of said interface in a heated, deuterium gas enriched atmosphere . . . .).  Thus, the Board correctly determined that claim 2 must be given product-by-process treatment and, therefore, requires deuterium at the interface, "but it does not require any specific process that results in deuterium at the interface."  (A59.)  In short, the Board found that the process of claim 2 (in bold below) must not be considered for purposes of patentability.

> A field effect transistor having an interface between a silicon semiconductive layer and a gate oxide layer comprising silicon oxy nitride, said transistor being passivated by covalently bound deuterium atoms at said interface and thereby having an increased resilience to hot carrier effects, said field effect transistor being characterized by ***post-fabrication passivation for at least one hour in a deuterium gas-enriched atmosphere heated to a temperature of at least 200° C., and wherein said post-fabrication passivation is conducted sufficiently to provide to said transistor a <u>practical lifetime at least about ten times that provided by a corresponding passivation with hydrogen</u> gas, wherein practical lifetime is taken as 20% transconductance degradation as a result of electrical.***

(A118 at 8:22–35 (emphasis added).)

This finding was made explicit in the Board's Notice of Institution.  (A2589–90, Decision to Institute (italicizing process limitations of claim 2).)   In construing the claim language in bold above, the Board set forth its understanding as to the scope of the claimed process.  It concluded that "we do not give weight to the process," and claim 2 "does not require any specific process that results in deuterium at the interface."  (A2590; *accord* A118.)

The 10-fold lifetime improvement limitation of claim 2 (underlined above) is recited as **part of the process** and does not connote any structure not already recited in the claim itself (*i.e.*, deuterium at the interface).  Indeed, it is undisputed that the deuterium at the interface is the sole structure responsible for the lifetime improvement.  (A2625, University's Patent Owner Response (Below, the University argued that "[the '387 patent] claim language requires improved resistance to hot carrier effects **resulting from** retention of deuterium at the silicon/insulator interface **resulting from** post-fabrication passivation using deuterium.") (emphasis added).)  Thus, the University cannot rely on this limitation to distinguish prior art such as Lisenker, which indisputably discloses deuterium at the interface.  *Amgen,* 580 F.3d at 1369; *see also* (Lisenker at A2510 at 10:29–35; A2512 at 12:3–9, 15–17; A2499 at Fig. 1.).

## B.    The Law Does Not Support the University's Arguments, Which Were Properly Rejected by the Board

The University may argue that the process of claim 2 imparts additional structure beyond that which is explicitly claimed, per this Court's opinion in *Greenliant Sys., Inc. v. Xicor LLC,* 692 F.3d 1261, 1268 (Fed. Cir. 2012).  *Greenliant* states "if the process by which a product is made imparts 'structural and functional differences' distinguishing the claimed product from the prior art, then those differences 'are relevant as evidence of no anticipation' **although they 'are not explicitly part of the claim**.'"  *Greenliant*, 692 F.3d at 1268 (emphasis added).  Claim 2, however, explicitly

recites the structure (*i.e.*, deuterium at the interface) that is imparted by the process.

Thus, *Greenliant* is inapposite here.[18]

### C. The University Failed to Raise Below or Argue on Appeal the Board's Product-by-Process Treatment of Claim 2 and Has, Therefore, Waived This Issue.

The University has not challenged the Board's finding that claim 2 should be

given product-by-process treatment on appeal. Nor could it. The University waived

any such challenge at oral argument before the Board:

> First of all, we agree the claims of the '204 and '387 patents
> are all product-by-process claims, as shown in Micron's
> summary slide number 16. . . . We're not asking the court
> to reverse itself on whether the claims of the two patents
> are actually product-by-process claims or how they should
> be resolved as far as construction is concerned.

---

[18] In its Patent Owner's Response, the University unsuccessfully relied on *Greenliant* with regard to another product-by-process claim, namely, claim 1. In so doing, the University argued that the recited process ("post-fabrication passivation using deuterium….") of claim 1 imparts structure other than that which is explicitly claimed. The Board properly rejected the University's argument because i) the recited process did not impart structure beyond that which was already claimed and the experimental results relied upon by the University in its application failed to link lifetime extension to anything other than general deuterium passivation, as opposed to post-fabrication passivation. (A58–59.) Notably and discussed in further detail in Section V.A.1, the University argued that the "ten to fifty-fold difference" results from post-fabrication passivation such that "this substantial difference mandates that such claimed post-fabrication passivation step be considered in determining the patentability of the subject claims." (A2625–26.) In other words, the University argued that the disclosure of post-fabrication passivation in deuterium necessarily results in a 10-fold lifetime improvement. The University admits that Lisenker discloses post-fabrication passivation (*see* Blue Br. at 8) and, by its own logic, tacitly admits that Lisenker also discloses the attendant lifetime improvement.

(A2903 at 27:2–9.)  Nor has the University challenged the Board's finding that claim 2 requires deuterium at the interface, but "does not require any specific process that results in deuterium at the interface."  (A59.); *see generally*, Blue Br.   The University's failure to challenge the Board's finding below, or on appeal, amounts to a waiver of the issue.  *In re Baxter Int'l Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) (". . . [W]e generally do not consider arguments that the applicant failed to present to the Board.") (citing *Watts*, 354 F.3d at 1367–68); *see also Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382–83 (Fed. Cir. 1999) (noting that the court "is entitled to assume that an appellant has raised all issues it deems important" and that "[a]n issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived"); *see also Novosteel SA v. U.S.*, 284 F.3d 1261 at 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice;  reply briefs reply to arguments made in the response brief--they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."); *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1355 (Fed. Cir. 2003) ("Abbott has waived the doctrine of equivalents argument by failing to raise it in its opening brief.").

Because the Board properly found that the 10-fold lifetime improvement limitation must not be considered for purposes of patentability and the University failed to challenge this finding, whether a 10-fold lifetime improvement is taught by or obvious in view of the prior art is of no moment to the patentability of claim 2.  Thus,

if the Court determines this issue was waived, it need not reach a decision on

inherency and obviousness.

## CONCLUSION

For the reasons above, the Court should affirm the judgment of the Board, as it is supported by substantial evidence.

Dated:  October 14, 2014          Respectfully submitted,

                                  */s/ Adam R. Shartzer*
                                  Ruffin B. Cordell
                                  Timothy W. Riffe
                                  Adam R. Shartzer
                                  Fish & Richardson P.C.
                                  1425 K Street, NW, 11th Floor
                                  Washington, DC 20005
                                  Tel: (202) 783-5070
                                  Fax: (202) 783-2331

                                  *Attorneys for Appellee,*
                                  Micron Technology, Inc.

## CERTIFICATE OF SERVICE AND FILING

I certify that I electronically filed the foregoing document using the Court's CM/ECF filing system.  Counsel was served via CM/ECF on October 14, 2014.

Mr. Daniel E. O'Toole
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Room 401
Washington, DC  20439

George C. Summerfield                    *Attorneys for Appellant*
Rolf O. Stadheim
STADHEIM & GREAR, LTD.
400 North Michigan Avenue
Suite 2200
Chicago, Illinois 60611


*/s/ Timothy W. Riffe*
Timothy W. Riffe

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorney certifies that the opposition brief for Appellee Micron Technology, Inc. complies with the type-volume limitation set forth in Fed. R. App. P. 28.1(e)(2)(B).  The relevant portions of the brief, including all footnotes, contain 12,172 words as determined by Microsoft Word.

Dated:  October 14, 2014

/s/ Adam R. Shartzer
Adam R. Shartzer